UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

APR 2 6 2004

MICHAEL N. MILBY, CLERK OF COURT

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL] ) ) ) | CIVIL ACTION NO. H-03-4438 |
| STATE OF TEXAS *ex rel.* [UNDER SEAL], ) | |
| PLAINTIFFS, ) | FILED UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT [31 U.S.C. § 3730(b)(2)] AND TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res. Code Ann. § 36.102(b)] |
| *v.* ) | |
| [UNDER SEAL] ) | |
| DEFENDANT. ) | |

**FIRST AMENDED COMPLAINT**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA<br>*EX REL*. ROBERT E. MCCASLIN, JR. | ) ) ) | CIVIL ACTION NO.<br>H-03-4438 |
| AND | ) ) | |
| STATE OF TEXAS<br>*EX REL*. ROBERT E. MCCASLIN, JR., | ) ) ) | FILED UNDER SEAL PURSUANT<br>TO THE FALSE CLAIMS ACT [31<br>U.S.C. § 3730(b)(2)] AND TEXAS |
| PLAINTIFFS, | ) ) ) | MEDICAID FRAUD PREVENTION<br>LAW [Tex. Hum. Res. Code Ann.<br>§ 36.102(b)] |
| *v.* | ) ) | |
| HARRIS COUNTY HOSPITAL DISTRICT, | ) ) | JURY TRIAL DEMANDED |
| DEFENDANT. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff and <u>qui tam</u> Relator Robert E. McCaslin, Jr., through his attorneys

Phillips & Cohen LLP and Kreindler & Associates, P.C., for his First Amended Complaint

against Harris County Hospital District alleges as follows:

I.   <u>INTRODUCTION</u>

1.     This is an action to recover damages and civil penalties on behalf of the

United States of America arising from false and/or fraudulent statements, records, and

claims made and caused to be made by the defendant and/or its agents and employees

in violation of the Federal False Claims Act, 31 U.S.C. §3729 <u>et</u> <u>seq</u>., ("the FCA" or "the

Act"), and the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.001

<u>et</u> <u>seq</u>.

2.    This <u>qui tam</u> case is brought against defendant Harris County Hospital District ("HCHD")  for knowingly defrauding the federal Government in connection with the Medicare, Medicaid and Champus/Tricare programs.  As alleged below, since at least 1997 Harris County Hospital District systematically billed these programs for services and related costs when HCHD knew it was not entitled to payment for such services.  As a direct result of Defendant's improper practices, the federal Treasury has been damaged in substantial amount.

3.    The FCA was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153.  Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.  The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

4.    The Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal Government.

5.    The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery.  The Act

requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time). Based on these provisions, qui tam plaintiff and relator Robert E. McCaslin, Jr., seeks through this action to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein, in every jurisdiction to which defendant's misconduct has extended. As set forth below, defendant's actions alleged in this Complaint also constitute violations of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§36.001 et seq.

6.     While the precise amount of the loss to the federal and state government cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against the defendant under the facts alleged in this Complaint amounts to millions of dollars.

II.     PARTIES

7.     Plaintiff/relator Robert E. McCaslin, Jr., is a resident of Houston, Texas. In April 2001, Mr. McCaslin was hired by defendant Harris County Hospital District as a Patient Account Representative. He is assigned to the Medicare Outpatient "follow-up" section in the Patient Business Services Division. He has knowledge of the false claims contained in this Complaint, and brings this action for violations of the False Claims Act on behalf of himself and the Government pursuant to 31 U.S.C. §3730(b)(1) and the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.101.

8.     Defendant HCHD, located in Houston, Texas and in Harris County, Texas, operates three hospitals, 11 community health centers, a freestanding HIV/AIDS facility, dental clinics, satellite clinics at 13 area homeless shelters, six school-based clinics, and four mobile units.

– 3 –

III.   JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. §1331 and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. In addition, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in this Complaint.   Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

10.     This Court has personal jurisdiction over the defendant pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the defendant has at least minimum contacts with the United States. Moreover, the defendant can be found in, resides in or transacts or has transacted business in the Southern District of Texas.

11.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because the defendant can be found in, and transacts or has transacted business in the Southern District of Texas.

IV.   BACKGROUND

A.   DEFENDANT

12.     Defendant Harris County Hospital District ("HCHD") is one of the nation's largest long-term acute care providers. HCHD operates Ben Taub General Hospital ("Ben Taub"), Lyndon B. Johnson General Hospital ("LBJ"), and Quentin Mease Community Hospital ("Quentin Mease"), as well as numerous other facilities.

13.     Ben Taub is one of the nation's busiest trauma centers, caring for more than 100,000 emergency patients each year. Ben Taub is an elite "Level 1 Trauma Center,"

– 4 –

one of only two in the Harris County area. Level 1 Trauma Centers receive patients with the most critical injuries.

14.     LBJ's Department of Emergency Medicine is a verified "Level 3 Trauma Center" and is the only trauma facility positioned to serve the needs of Northeast Harris County. LBJ is one of only nine Level 3 Trauma Centers in the greater Houston area. However, LBJ handles approximately three-to-four times the patient load of any other Level 3 Trauma Center in the region with more than 77,000 emergency patient visits each year, and more than 14,000 inpatient admissions.

15.     Quentin Mease is a 49-bed long-term physical rehabilitation hospital located five miles east of the Texas Medical Center. The hospital's medical staff comprises faculty and residents from Baylor College of Medicine.

16.     Billing for all of HCHD's facilities is handled out of the main business office at 2525 Holly Hall, Houston, Texas 77054.

B.     FEDERAL HEALTH CARE PROGRAMS

17.     Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted. The Medicare program has two parts. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of physicians' services, certain pharmaceutical products, diagnostic tests and other medical services not covered by Part A.

18.     Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states

– 5 –

participating in the program; the funding division varies from state to state but usually approximates an equal division. Under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor. Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary"). After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP"). For fiscal year 2005, the FFP for Texas is 60.87%, meaning that the federal government will pay that percentage of the state's Medicaid costs. The Texas Health and Human Services Commission (HHSC) has been the administering state agency for the Medicaid program in Texas since January 1993. While states are responsible for the hands-on operation of Medicaid, the federal government plays a very active oversight role. The Centers for Medicare and Medicaid Services (CMS), part of the U.S. Department of Health and Human Services, oversees the Medicaid program. CMS approves the Medicaid State Plan that each state creates, as well as any waivers for which states apply.

19.    TRICARE is a regionally managed health care program for active duty and retired members of the uniformed services, their families, and survivors. TRICARE was formerly known as The Civilian Health And Medical Program of the Uniformed Services ("CHAMPUS").

–6–

20.    The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

21.    Much of the daily administration and operation of the Medicare program is managed through contracts with private insurance companies that operate as fiscal intermediaries.    Fiscal Intermediaries are responsible for accepting claims for reimbursements under Medicare Part A (and some claims under Part B), and making payments for such claims.   "Medicare Carriers" are responsible for accepting and paying claims for reimbursements under Medicare Part B.

22.    Champus/Tricare is a regionally managed health care program for active duty and retired members of the uniformed services, their families, and survivors. Champus/Tricare brings together the health care resources of the Army, Navy and Air Force and supplements them with networks of civilian health care professionals to provide better access and high quality service while maintaining the capability to support military operations. Like the Medicare Program, much of the daily administration and operation of the Tricare program is managed through contracts with private companies.

   a.  MEDICARE SECONDARY PAYER CLAIMS

23.    Originally, Medicare was the primary source of payment for the medical expenses of all of its beneficiaries.  However, in 1980, congress passed the Medicare Secondary Payer ("MSP") provisions, a collection of statutory provisions codified with the intention of reducing Medicare spending and ensuring the continued fiscal integrity of the Medicare program. Omnibus Budget Reconciliation Act of 1980 ("OBRA 80"). Medicare's

– 7 –

shift from the primary payer to the secondary payer with a right of reimbursement reflects the overarching statutory purpose of reducing Medicare costs.

24.     The MSP provisions provide that, under certain conditions, Medicare will be the secondary rather than primary payer for its insureds.     Under the MSP provisions Medicare is precluded from, *inter alia*, making payment for services to the extent that payment has been made or can reasonably be expected to be made promptly under (1) workman's compensation, (2) liability insurance, or (3) no-fault insurance.  42 C.F.R. § 411.20.

25.     Where a provider has reason to believe that it provided services to a Medicare beneficiary for which payment under liability insurance may be available, for the first 120 days the provider must bill only the liability insurer <u>unless</u> it has evidence that the liability insurer will not pay within the 120 days.

26.     Medicare does make conditional payments for covered services, even when another source may be obligated to pay, if that other source is not expected to pay promptly. 42 C.F.R. § 411.50.  "Prompt" or "promptly" means payment within 120 days after receipt of the claim. 42 C.F.R. § 411.50.  Under these circumstances, the provider may bill Medicare within the 120 day "prompt" payment period if it supplies documentation to support the fact that payment will not be made promptly.

27.     After the 120 day "prompt" payment period has ended, the provider may (but is not required to) bill Medicare for conditional payment if the liability insurance claim is not finally resolved.

28.     If the provider chooses to bill Medicare, it must remove all claims against the liability insurer and any lien it has placed on the beneficiary's settlement.

– 8 –

29.     The amount that the provider is entitled to recover is different based upon whom the provider chooses to bill.  If the provider bills Medicare, the provider must accept Medicare's payment determination as to what constitutes payment in full and may charge beneficiaries only for the associated deductible and coinsurance.

30.     If the provider chooses to pursue its claim against the liability insurance settlement, it may not also bill Medicare.

31.     If the provider pursues liability insurance, the provider may charge beneficiaries actual charges, up to the amount of the proceeds of the liability settlement, but may not collect payment from the beneficiary until after the proceeds of liability insurance are available to the beneficiary.

32.     Where a provider or supplier chooses to bill Medicare for conditional payment, it must cease attempts to collect the same payment from the proceeds of the liability settlement (including any liens it may have placed on or against any settlement). The continued pursuit of collection of payment of actual charges from the proceeds of liability insurance after the provider or supplier has billed Medicare violates the Provider Agreement.

33.     The MSP provisions prohibit double billing.  A provider is not allowed to bill Medicare and simultaneously bill the liability insurer or assert or maintain a lien against the beneficiary's liability insurance settlement.  68 F.R. 43940 (2003).

B.     PRISONER CLAIMS

34.     Medicare does not pay for services furnished to individuals or groups of individuals who are in the custody of the police or other penal authorities or in the custody of a government agency under a penal statute unless those individuals or groups of

– 9 –

individuals are required to repay the cost of medical services they receive while in custody. 42 CFR 411.4(b).  In addition, the State or local government entity must enforce the requirement to pay by billing all such individuals, whether or not covered by Medicare or any other health insurance, and by pursuing collection of the amounts they owe in the same way and with the same vigor that it pursues the collection of other debts.  42 CFR 411.4(b).  In the State of Texas, in some instances hospital districts such as HCHD have a right of subrogation to the prisoner's right of recovery from any source, limited to the cost of services provided.  In addition, in these instances a county or hospital district has the authority to recover the amount expended in a civil action.  Vernon's Ann.Texas C.C.P. Art. 104.002.

35.     Medicaid does not allow medical treatment of prisoners to be billed to the program.  According to 42 CFR 435.1008, FFP is not available in expenditures for services provided to individuals who are inmates of public institutions.  A "public institution" is an institution that is the responsibility of a governmental unit or over which a governmental unit exercises administrative control. 42 CFR 435.1009. This includes county jails and state prisons.

36.     Providers that discover material omissions or errors in claims submitted for Medicare reimbursement are required to disclose them to the Government or its Fiscal Intermediaries.  Providers may not accept financial windfalls from errors, and may not conceal them.  42 U.S.C. §1320-a-7b(a)(3) imposes a duty to disclose known errors in claims for payment by making a failure to disclose a felony.  The law provides:

> Whoever . . . having knowledge of the occurrence of any event
> affecting (A) his initial or continuing right to any such benefit or
> payment . . . conceals or fails to disclose such event with an

> intent fraudulently to secure such benefit or payment either in
> a greater amount or quantity than is due or when no such
> benefit is authorized, . . . shall in the case of such a . . .
> concealment or failure . . . be guilty of a felony.

Accordingly, providers have an affirmative duty to disclose material information that indicates that their claims for reimbursement were inaccurate.

V.    ALLEGATIONS

    A.    SECONDARY PAYER VIOLATIONS

37.    Since at least 1997, upon the arrival of Department Director Alice Michelson and Vice-President Theresa Etherly, HCHD's policy and practice has been to file a lien against a beneficiary's liability insurance settlement and, improperly, to bill Medicare for services rendered to the beneficiary without regard to the 120–day "prompt" payment period.

38.    HCHD's policy and practice has been to file a lien against any settlement almost immediately, and then shortly thereafter to bill Medicare for the same services. Many times the amount of the lien is left blank because the hospital does not yet know the total charges incurred by the beneficiary.

39.    After the lien is filed, HCHD waits to be contacted by the attorney representing the beneficiary seeking to release the lien.   When the attorney contacts HCHD to inquire about releasing the lien, the call is handled by a Patient Account Representative.  HCHD has a group of Patient Account Representatives who routinely handle calls about releasing liens.  Occasionally, when the select group of account representatives is busy, Mr. McCaslin will take such a call.

40.     The "settlement/compromise" process between the attorney of the beneficiary and HCHD is handled by Manager Dorothy O'Day. For liens involving more than a small sum of money, Ms. O'Day turns the call over to the attorneys employed by Harris County who then handle the filing settlement/compromise and the releasing of the lien.

41.     In May 2003, Mr. McCaslin received a telephone call from an attorney asking HCHD to release a lien it had filed against any settlement on behalf of a patient. The patient was in an accident in April 2002, in which the patient was struck by a bus and suffered two broken legs and a torn aorta. Upon reviewing the file, Mr. McCaslin discovered that Medicare had paid over $100,000.00 for this claim, despite this clearly being a liability case where Medicare was not the primary payer.

42.     Mr. McCaslin brought the fact that HCHD billed Medicare as the primary payer rather than first pursuing payment from the liability insurance to the attention of his supervisor, Prefance Baker, who agreed with McCaslin that it appeared that the correct procedure was not being followed. Mr. McCaslin and Ms. Baker brought the patient account to the attention of the Department Director Alice Michelson. After reviewing the account, Ms. Michelson advised Mr. McCaslin and Ms. Baker that they were wrong and that the procedure that HCHD was following was correct. Ms. Michelson further advised that this was the policy of Patient Business Services, instituted by herself and the Vice-President Theresa Etherly.

43.     Mr. McCaslin advised Ms. Micheslon, that he was not comfortable, ethically or legally, settling the account of the patient for the $12,000 still owed the hospital for copayments, deductibles and non-covered items, when Medicare had paid approximately $100,000. Mr. McCaslin asked her to review HCHD's policies and procedures and

– 12 –

immediately filed an internal complaint with the compliance department at HCHD.  The internal complaint was handled by Sheila McDaniel.  Ms. McDaniel claimed that "nothing had been done wrong on this account in question."

44.     The case above was not unique.  For example, on May 11, 2003, a sixty-six year old woman was involved in a motor vehicle accident.  The statement of account detail states that the patient was treated as a "level 1 Observation 18-23 Hours" and incurred a bill for $14,589.52.  The notes in the transaction detail from the date of the accident indicate that "Pt involved in MVA" and "Pt has Medicare A&B."  The hospital made no effort to identify third-party liability insurance even though the transaction detail lists the patient's motor vehicle case number from the Harris County Sheriff and the badge or ID number of Deputy that responded.  Instead, the hospital billed Medicare immediately, and Medicare paid $10,109.53 within three months of the accident.

45.     In May 2003, Mr. McCaslin wrote a letter to "Program Integrity" at Trailblazer Health Enterprises, LLC ("Trailblazers"), the Fiscal Intermediary for HCHD, inquiring about HCHD's handling of the $100,000 bus accident claim, and of the manner in which liability claims in general were being handled at HCHD.

46.     At the end of May 2003, after the above interaction between Mr. McCaslin and Ms. Michelson concerning the bus accident patient lien, Ms. Michelson required the entire Patient Business Services Division to attend a seminar about third-party liability and Medicare Secondary Payer requirements.  The seminar was led by an attorney from "Medical Reimbursements America," a healthcare management company that pursues payment on liability claims on behalf of providers during the initial 120 days before they can bill Medicare.  During the seminar the attorney described situations factually identical to the

– 13 –

patient lien situation encountered by Mr. McCaslin and informed everyone that it would violate the False Claims Act if the hospital was to operate in this matter. Also attending this seminar were a Harris County attorney and an administrative assistant from the same office. Despite this, no corrective actions were taken by HCHD.

47.     For example, on June 10, 2003, another patient, a sixty-six year old man was involved in a motor vehicle accident. The patient stated that he was driving his car and pulled out into the street and was hit on the driver's side. The transaction detail indicates that on June 10, 2003 HCHD knew that this patient was eligible for Medicare Part A and B. On August 6, 2003, HCHD was contacted by Allstate Insurance to verify the charges and amount due from the accident. HCHD did not set up a lien. Even though this was less than 60 days after the accident, Medicare had already been billed and paid $1,150.07. The notes in the transaction detail indicate, "Insur rep sts ready to pay on claim......acct was bill out to Care; Paid on 7/28/03."

48.     On or about July 17, 2003, a 73 year-old man, was involved in a hit and run accident while riding a scooter. As a result of the accident, the patient was placed on life support. According to the Transaction Detail, on July 17, 2003, a friend of the patient verified to HCHD that he had Medicare coverage. On August 7, 2003, HCHD ordered a police report of the accident. On August 13, HCHD prepared a lien on any liability settlement. On August 14, 2003, HCHD learned the name of the driver that struck the patient. According to the Transaction Detail HCHD also learned the driver's Texas liability insurance policy number. HCHD filed the lien on August 21, 2003. HCHD billed Medicare on September 17, 2003 in the amount of $282,968.75. On September 30, 2003, Medicare paid $95,593.77. The patient was discharged on October 8, 2003. According to the

– 14 –

Transaction Detail, HCHD made only a single, unanswered telephone call on August 14, 2003 to the driver that struck the patent in an attempt to identify the driver's liability carrier. HCHD made no further effort to pursue third-party liability, despite clearly knowing that such insurance existed.

49.    Throughout the summer, Mr. McCaslin inquired about new policy changes as a result of the seminar. On July 9, 2003 Mr. McCaslin sent an email to Dorothy O'Day stating, "A couple of days ago it was announced that auto liability/liens were being sent to the county atty or to the vendor and instructions were forthcoming. I just wondered if I missed [the instructions]." McCaslin's email continued, "Also, has there been a policy development on how to handle the many claims that have been inappropriately billed to Medicare instead of following the law as described in the seminar which has been in effect since 1980." Ms. O'Day did not respond to this email.

50.    In August 2003, Mr. McCaslin received a letter from Trailblazers stating that "contact with the provider's office determined that an error was made in billing the charges on this claim. The claim has been forwarded to our Overpayment Department to recover the payment made by Medicare. Your records have been corrected." It is unknown who Trailblazers contacted at HCHD.

51.    HCHD knew or should have known that when it provided services to Medicare beneficiaries — knowing that liability insurance may be available — that these claims would be covered under the MSP regulations. HCHD analyzed the claims and, when it knew that liability insurance was available, filed a lien against any settlement to protect HCHD's interest in payment. HCHD also, however, deliberately ignored the MSP regulations

designed to save Medicare money and systematically billed Medicare for payment on these claims.

52.     Plaintiff believes and therefore alleges that HCHD has ignored the MSP liability regulations and continued this practice from approximately 1997 through the present.

53.     In fact, on August 12, 2003, one month after Mr. McCaslin made his request to see HCHD's new policy, a "new process" email was sent from Dorothy O'Day to all of "Patient Financial Services."  Under the new process, claims are allegedly being sent by HCHD to the Medical Reimbursements of America, the same company that led the seminar, for collection during the initial 120 day "promptly" period.  All accident accounts with balances of $50,000.00 or greater, or accounts of minors in the amount of $1,000.00 or less, are referred to the Harris County Attorney's Office.   However, it is clear that the new policy has not been implemented as is reflected by the situation described in paragraph 47, where the hospital made only one phone call prior to billing Medicare, even though the hospital knew that liability insurance was available.

54.     It is estimated that, for any given year, thousands of individual claims were improperly submitted to Medicare.  Although HCHD has been aware of the improper billing of MSP claims for years, it did not make revisions to the policy until August 2003, and its actual billing practices do not appear to have changed at all.

55.     Notwithstanding the fact that, prior to August 2003, HCHD submitted thousands of claims in violation of the MSP regulations,   HCHD has not repaid or reimbursed the federal Government for claims that were improperly paid.

56.     HCHD submits claims to Medicare and Tricare using the same form.  On that

– 16 –

form, HCHD is required to report external causes of injury and "occurrence codes" that identify, among other things, help the government identify claims that may involve third-party liability. In particular, by properly using these codes, HCHD is required to notify the government when a patient's injury was sustained in a motor vehicle collision.

57.     Mr. McCaslin alleges that HCHD did not properly report the causes of patient injuries or make appropriate use of the Occurrence Codes when submitting claims to Medicare and Tricare. By submitting incomplete or inaccurate information, HCHD submitted false claims to the government.

58.     By incorrectly submitting claims that involved secondary payer and third-party liability issues, HCHD knowingly presented, or caused to be presented, false and fraudulent claims, used false records and statements to get false or fraudulent claims paid, and knowingly failed to disclose material facts, in order to obtain government reimbursement for health care services provided under the Medicare program and Champus/Tricare program.

B.     PRISONER CLAIMS

59.     In May 2002, CMS issued a Program Memorandum explaining that a recent Office of Inspector General audit of Medicare payments identified a vulnerability for the Medicare trust fund with respect to the issue of prisoner claims. The study identified potential improper payments for beneficiaries who, on the date of service on the claim, were in state or local custody under the authority of a penal statute. HCHD learned through this Program Memorandum that CMS planned on establishing claim level editing using data received from the Social Security Administration ("SSA") to identify the names of Medicare beneficiaries and time periods where the beneficiary is (or was) in State or

– 17 –

local custody. Claims then would be rejected automatically where the dates from the SSA file indicate that the beneficiary was in custody on the date(s) of service. According to the Program Memorandum, intermediaries and carriers were required to implement the process by which prisoner claims would be identified by October 1, 2002.

60.    As a result of the upcoming edits designed to deny claims submitted on behalf of incarcerated individuals, HCHD contracted with Universal Fidelity Corporation ("UFC") to submit Medicare claims of prisoners before the edits went into effect. UFC's Healthcare Services Division provides a variety of medical billing services to private companies as well as Federal, State and Local governments. Ms. Ana Velazquez, a UFC employee, was stationed at HCHD's main billing office to process prisoner claims and attempt to secure payment through Medicare these claims. Claims not submitted before the edits went into effect would be denied automatically. HCHD sought reimbursement for claims of prisoners despite the fact that they knew or should have known that HCHD was not entitled to reimbursement.

61.    In March 2003, Ms. Velazquez asked Glen Smith, a co-worker of McCaslin, for assistance filing a Medicare claim on behalf of a patient in custody of Harris County Sheriff's Department. Messrs. Smith and McCaslin researched the reimbursement of prisoner claims on the CMS website, and McCaslin informed Ms. Velazquez that, in his opinion, submitting the incarcerated individual's claims to Medicare would be fraud. Ms. Velazquez informed Tonya Wiltz, Assistant Manager of the Patient Financial Services Division, and Department Director Alice Michelson of McCaslin's comments. Alice Michelson advised McCaslin that the prisoner claims were none of his business and also

made notes in the specific account file that billing Medicare for these claims was proper.

62.    After the conversation between Mr. McCaslin and Ms. Michelson, Ms. Michelson called a meeting with all employees of the patient financial services division. Tonya Wiltz led the meeting and  explained that HCHD's policy was that prisoner claims, if discovered, were to be submitted to Medicare or Medicaid for payment.

63.    Mr. McCaslin complained to the compliance department at HCHD that submitting prisoner claims to Medicare for payment was improper.  He was informed by Ms. McDaniel that Tonya Wiltz received verbal instruction from Trailblazer to file prisoner claims in this manner.  Ms. McDaniel told McCaslin that she would seek guidance from Trailblazer on the specific claim discussed in paragraph 58 above.

64.    In Fall of 2003, after Mr. McCaslin's inquiry in to the handling of prisoner claims, Tonya Wiltz announced to the patient financial services division that Trailblazers informed her that they will not pay any Medicare claims on behalf of incarcerated Medicare beneficiaries.

65.    Ms. Velazquez stopped working for UFC during the summer 2003.   In September 2003, she was hired by HCHD as a billing coordinator.

66.    Even though HCHD knows that it is not supposed to submit prisoner claims for reimbursement, HCHD continues to submit false claims for payment of services provided to incarcerated patients.  Mr. McCaslin continues to see 10-20 claims a month submitted by HCHD that are caught by the edits and rejected by Trailblazers.

## COUNT I
### False Claims Act
### 31 U.S.C. §3729(a)(1)

67.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-66.

68.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729 *et seq.*

69.     Through the acts described above, defendant HCHD (since at least 1997) knowingly presented, or caused to be presented, false or fraudulent claims, to the United States Government, in order to obtain government reimbursement for health care services provided under Medicare.

70.     As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

## COUNT II
### False Claims Act
### 31 U.S.C. §3729(a)(2)

71.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-66.

72.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729 *et seq.*

73.     Through the acts described above, defendant HCHD (since at least 1997) has knowingly made, used and caused to be made and used false records and statements to get false or fraudulent claims paid in order to obtain government reimbursement for health care services provided under Medicare.

– 20 –

74.     As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

**COUNT III**
False Claims Act
31 U.S.C. §3729(a)(7)

75.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-66.

76.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729 *et seq.*

77.     Through the acts described above, defendant HCHD (since at least 1997) has knowingly failed to disclose to the United States material facts in order to obtain government reimbursement for health care services provided under Medicare.

78.     As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount yet to be determined.

**COUNT IV**
Texas Medicaid Fraud Prevention Law
Tex. Hum. Res. Code Ann. §36.002

79.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-63 above as though fully set forth herein.

80.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

81.     By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

82.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

83.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Texas State Government.

84.     As a result, Texas State monies were lost through (a) the payment of such false and fraudulent claims and (b) the non-payment or non-transmittal of money or property owed to the Texas State Government by defendant.

85.     By reason of the defendant's acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial. Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Prayer

WHEREFORE, plaintiff prays for judgment against defendant as follows:

1.     that Defendant cease and desist from violating 31 U.S.C. §3729 et seq.;

2.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3.     that plaintiff be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4.     that plaintiff be awarded all costs of this action, including attorneys' fees and

expenses; and

5.     that the United States and plaintiff recover such other and further relief as the Court deems just and proper.

6.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Texas has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of  Tex. Hum. Res. Code Ann. §36.002.

Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands a trial by jury.

KREINDLER & ASSOCIATES, P.C.

By: _____

Mitchell R. Kreindler
Attorney-in-Charge
Texas Bar No. 24033516
S.D. Tex. Bar No. 32980
9219 Katy Freeway, Suite 237
Houston, TX 77024-1527
Tel: (713) 647-8888
Fax: (713) 647-8889

OF COUNSEL:
PHILLIPS & COHEN LLP
Mary Louise Cohen
Matthew B. Smith
Phillips & Cohen, LLP
2000 Massachusetts Ave, N.W.
Washington, D.C.  20036
Tel: (202) 833-4567
Fax: (202) 833-1815

ATTORNEYS FOR QUI TAM PLAINTIFF
ROBERT E. MCCASLIN, JR.

April 26, 2004